UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

- versus -

RONALD MAYO,

                Defendant.

MEMORANDUM OF DECISION
13-cr-251 (JG)

---

JOHN GLEESON, United States District Judge:

On July 29, 2013, upon the conclusion of a hearing on the defendant's motion to suppress evidence, I granted the motion, promising that this written memorandum explaining the decision would follow.

A.    *The Charge*

On April 23, 2013 a grand jury in this district returned a one-count indictment charging Ronald Mayo with being a felon in possession of a firearm. ECF No. 5. The charge arose out of a street stop on the night of April 4, 2013, during which New York City Police Department ("NYPD") officers recovered a firearm from Mayo's waistband. On June 14, 2013 I set a schedule for Mayo's anticipated motion to suppress the firearm and also set a July 29, 2013 trial date in the event the case survived the motion. Minute Entry, June 14, 2013. However, instead of filing the motion to suppress, Mayo's counsel subsequently informed me in a letter dated June 28, 2013 that Mayo had decided to plead guilty. ECF No. 9.

The case was called for the guilty plea on July 12, 2013. Minute Entry, July 12, 2013. Mayo changed his mind about pleading guilty during the plea proceeding, and so the case was put back on track for trial on July 29, 2013. *Id.* The government asked whether the motion

to suppress would be renewed, and Mayo's counsel responded that it would. July 12, 2013 Tr. 8:17-19, 9:12-19. The motion was simple: Mayo claimed that the firearm was seized from him after a suspicionless stop; the government claimed that the search and seizure were lawful because the police saw the firearm in Mayo's waistband before they stopped him. After discussing the matter with counsel, we dispensed with moving and responding affidavits and I scheduled the suppression hearing for the morning of the trial. July 12, 2013 Tr. 10:17-14, 13:11-23. Specifically, I informed counsel that we would select the jury but not swear it, conduct the suppression hearing, and then, if the motion were denied, swear the jury and proceed directly to the trial. July 12, 2013 Tr. 9:20-25.

As mentioned, at the conclusion of the hearing I granted the motion. Minute Entry, July 29, 2013. In light of that decision, the parties agreed that I should disband the unsworn jury panel, since the government's case against Mayo stands or falls with the evidence I suppressed. July 29, 2013 Tr. 148:6. We further agreed that by August 30, 2013, the government would inform me whether it will move to dismiss the indictment or seek appellate review of my ruling, as it is entitled to do under 18 U.S.C. § 3731. July 29, 2013 Tr. 148:21-149:5.

B.  *Findings of Fact*

At about 10:40 pm on April 4, 2013, NYPD Officers Konrad Zakiewicz and Salwa Jwayyed and Sergeant Kwame Kipp were on a routine anti-crime patrol in the Bedford-Stuyvesant area of Brooklyn. Tr. 97:2-10 (Jwayyed).[1] They were in plainclothes in an unmarked police vehicle. Tr. 62:10-14 (Zakiewicz), 97:13-18 (Jwayyed), 125:12-19 (Kipp).

---

[1] I will use "Tr." to denote the transcript from the July 29, 2013 hearing throughout the remainder of this Memorandum.

2

Zakiewicz was driving; Jwayyed was next to him in the front; Kipp, who was their supervising officer, rode in the back. Tr. 62:15-20 (Zakiewicz), 97:19-24 (Jwayyed), 125:20-25 (Kipp).

The officers and their sergeant were driving slowly in a northbound direction on Marcy Avenue. Tr. 62:23-63:4 (Zakiewicz). As they entered the intersection of Marcy Avenue and Clifton Place they observed the defendant Mayo walking southbound on the sidewalk on the west side of Marcy Avenue. Tr. 66:7-17 (Zakiewicz), 99:12-20 (Jwayyed), 127:19-128:2 (Kipp). Mayo was thus walking toward the police vehicle, and when the police first saw him he was in front of them and to their left, close to the intersection with Clifton Place. Tr. 68:2-5 (Zakiewicz), 99:19-22 (Jwayyed), 128:1-6 (Kipp). That intersection, as well as the area of the sidewalk where Mayo was walking, was well-lit by one street lamp almost directly across Marcy Avenue from Mayo and another that was directly ahead of him, across Clifton Place. Tr. 67:6-7 (Zakiewicz), 110:22-111:1 (Jwayyed).

When Zakiewicz saw Mayo he said to his colleagues, "I want to stop that guy." Tr. 69:11-12 (Zakiewicz). By the time he made that determination the car had rolled a little past the intersection. Tr. 109:15-21 (Jwayyed). Mayo, who had been walking towards the car, had already reached the intersection and turned right onto Clifton Place. Tr. 101:2-4 (Jwayyed). So Zakiewicz put the car in reverse and backed it into the intersection far enough until he could put it back in drive and make the left turn onto Clifton Place. Tr. 69:16-22 (Zakiewicz), 100:22-101:1 (Jwayyed), 128:23-25 (Kipp). He then drove a short distance down Clifton Place and pulled the car to the right side of the road, just next to where Mayo was walking. Tr. 69:25 (Zakiewicz), 101:5-8 (Jwayyed).

Jwayyed got out of the car first, followed by Kipp. Tr. 101:12-15 (Jwayyed). Jwayyed identified herself as a police officer and told May to stop, in response to which Mayo

3

raised his arms above his head. Tr. 101:19-21 (Jwayyed). By raising his arms above his head, Mayo elevated the bottom of his "hoodie" sweatshirt, revealing his waistband. Tr. 116:21-25 (Jwayyed). As a result Jwayyed and Kipp were able to see a firearm sticking out of Mayo's waistband. Tr. 116:20-117:3 (Jwayyed), 129:11-16 (Kipp). Jwayyed put her hands under Mayo's armpits, placed him up against a wall, Tr. 102:5-6 (Jwayyed), and yelled out "gun," Tr. 102:6 (Jwayyed). Kipp then seized the firearm. Tr. 70:14-15 (Zakiewicz), 103:15-18 (Jwayyed), 129:18-19 (Kipp). That evidence is the subject of this motion to suppress. Kipp heard Jwayyed state that Mayo was carrying a weapon, but Jwayyed did not make that statement until after Mayo was stopped. Tr. 141:9-20 (Kipp). No one observed the firearm in Mayo's possession until after he was stopped.

C. *Discussion*

    1. *The Legal Standards*

The Fourth Amendment forbids the government from violating "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It does not "proscribe all searches and seizures, but only those that are unreasonable." *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 619 (1989). A warrantless search or seizure is "per se unreasonable" unless it falls within "one of the few established and well-delineated exceptions" to the warrant requirement. *United States v. Streifel*, 665 F.2d 414, 419-20 (2d Cir. 1981). The exception at issue here exists when there is probable cause to believe that a crime has been committed and the person seized has committed it. "Probable cause exists where 'the facts and circumstances within (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being

4

committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (citing *Carroll v. United States*, 267 U.S. 132, 162 (1926). The exclusionary rule is applied to evidence obtained as a result of an unlawful seizure. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

Mayo was seized for Fourth Amendment purposes when Jwayyed identified herself as the police, told him to stop, and Mayo put his hands in the air. *See Kaupp v. Texas*, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of the Fourth Amendment occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (internal quotation marks omitted). The government does not contend otherwise. Rather, it contends that the seizure was justified because the officers and their sergeant, prior to the stop, had probable cause to believe that Mayo was carrying a firearm. For his part, Mayo concedes that if the officers indeed saw a firearm in his waistband before Jwayyed and Kipp got out of the car, the stop and subsequent recovery of the firearm were lawful.

2.  *The Application of the Law to the Facts as I Find Them*

The seizure of Mayo by the police was unjustified. Zakiewicz decided that he wanted to stop Mayo, but he had no lawful basis for doing so. The observations of the firearm by the police were the result of the seizure, not its cause. Accordingly, the firearm is the fruit of an unlawful stop and must be suppressed.

3.  *The Testimony I Decline to Credit*

The government's evidence in opposition to the motion included testimony that, if believed, established probable cause to arrest. First, Officer Zakiewicz testified that for a "split

5

moment" he could see the firearm in Mayo's belt. Tr. 72:1-2. Second, Jwayyed testified that she "saw something that appeared like the handle of a firearm" in Mayo's waistband. Tr. 112: 8-9. Both officers testified that they made these observations immediately upon first observing Mayo from the car, that is, before Zakiewicz put the police vehicle in reverse. Tr. 68:22-25 (Zakiewicz), 98:22-99:8 (Jwayyed). If credited, either witness's testimony would establish probable cause to arrest. As mentioned, Mayo does not contend otherwise. However, I decline the credit the testimony for the reasons discussed below.

Several factors undermine the officers' testimony. Zakiewicz's testimony on its face describes implausible, though not impossible, circumstances. Mayo was wearing a zippered "hoodie" that hung below the waistband of his pants by a couple of inches.[2] Tr. 89:22-24 (Zakiewicz). Even if the sweatshirt was unzipped, as Zakiewicz, Jwayyed, and Kipp testified, Tr. 68:12-21 (Zakiewicz), 100:5-7 (Jwayyed), 128:12-15 (Kipp), it would have draped down over the gun handle. Moreover, the firearm was sticking out of the left side of Mayo's waistband. Tr. 69:1-2 (Zakiewicz) (describing firearm handle as sticking out of left side of waistband), 102:7-8 (Jwayyed) (same), 129:23-24 (Kipp) (same). Thus, Mayo's position with respect to the officers (he was in front of them and on their left, a short distance away) could easily result in the open hoodie obscuring the weapon from their view. It was during questioning on this topic that Zakiewicz testified to his "split moment" glimpse of the weapon. Tr. 71:20-72:2.

In addition, there is reason to believe that Jwayyed's testimony has wavered as to whether she observed the firearm prior to the stop, undermining her credibility. The complaint in the case made reference to Zakiewicz's observation of a firearm before the stop, but not to

---

[2] It was nighttime in early spring and the average temperature that day was 39° Fahrenheit. Tr. 91:16-22.

6

such an observation by Jwayyed.  Complaint ¶ 2, ECF No. 1.  Complaints are not required to set forth all the facts known to the arresting officers, and they routinely state explicitly that they do not, but still, in the context of the other recitations in the complaint, the absence of any mention of an observation by Jwayyed is notable.

But there is one undisputed fact that dwarfs all others in undermining the testimony of these officers that they saw a firearm in Mayo's waistband before anyone exited the car: their mutual silence at the time about that critically important fact.  Few things are more important to the safety of the public and especially of the police themselves when they stop a suspect than the presence of a firearm.  A firearm on the scene is a big deal even to the most experienced officers, and the cases evidencing that reality are legion.[3]  The government would have me believe that Zakiewicz saw a firearm in Mayo's waistband and then let both Jwayyed and his sergeant exit the car to stop him without even mentioning to them that the person they were about to stop was carrying a gun.  It would have me believe that Zakiewicz decided he wanted to stop Mayo and also decided to communicate that decision to his colleagues but chose not to mention *why* he wanted to stop him.  It would have me believe that an officer who said he wanted to stop someone, apparently for no reason, chose not to tell his immediate supervisor the one fact that would make the stop lawful.

---

[3]  *See, e.g.*, *United States v. Doughty*, No. 08-cr-375, 2008 WL 4308123, at *2 (S.D.N.Y. Sept. 18, 2008) ("Officer Rodriguez saw 'what appeared to be' the handle of a firearm.  Officer Rodriguez yelled 'gun, gun,' and he unsheathed his own gun.  Hearing Officer Rodriguez yell 'gun,' Officer Omisore grabbed Defendant in a 'bear hug' and threw him into a nearby doorway."); *United States v. Smith*, No. 11-cr-677, at *1 (N.D. Ill. May 11, 2012) ("While focusing on Smith's waist, from inside the police car approximately 25 feet away from the sidewalk, Officer Byrne saw the butt of a handgun at Smith's waistband.  Officer Byrne testified that he stated 'gun' and Skarupinski stopped the slow-moving car."); *United States v. Grant*, No. 09-cr-337, 2009 WL 3921369, at *1 (E.D. Pa. Nov. 19, 2009) ("Officer McCarthy, believing based on his experience that Defendant was tucking a gun into his waistband, immediately said to Officer Hand: "Hand, Hand, I think he's got a gun."  The officers then pulled their car into the intersection . . . with their headlights on Defendant.  They exited the car, with their hands on or near their visible but holstered guns, and Officer McCarthy yelled to Defendant: 'Show me your hands.'").

Zakiewicz testified that he is required to alert his fellow officers if he believes someone they are about to come across is armed. Tr. 78:10-13. He explained his unusual decision to keep quiet about the presence of weapon in Mayo's waistband as follows:

> THE COURT: Why didn't you tell them when they got out of the car that there was a gun?
>
> ZAKIEWICZ: Everything happened so fast, and I don't expect them to – if they want to pull over a vehicle or stop somebody, I don't question.

Tr. 94:9-13. The first reason was false, at least to the extent that Zakiewicz intended to suggest that there was no time to mention the weapon. It doesn't take much longer to say "I want to stop that guy because he's carrying a gun" than it does to say "I want to stop that guy," which is what Zakiewicz in fact said. Before anyone got out of the car, Zakiewicz had time to put the car in reverse, back it up into the intersection, put it back in drive, and turn onto Clifton Place. The suggestion that he had no time to mention the critical fact that Mayo was carrying a gun in his waistband is impossible to square with the rest of his testimony. The second reason provided by Zakiewicz was nonsense. It might be true that Zakiewicz doesn't question other officers who want to stop someone, but that's not what happened here. *Zakiewicz* wanted to stop Mayo and said so; no one else in the car said he or she wanted to stop him.

Jwayyed was also afflicted by an inexplicable silence in the face of an alleged fact that everyone in law enforcement knows is something responsible officers don't keep secret. She agreed that it was an important part of her job as well as her practice to warn her colleagues if someone they are about to stop has a firearm, for both their safety and the safety of the public. Tr. 104:25-105:24. But she didn't do so on this occasion because, as she put it, "As soon as [Zakiewicz] said he was going to stop this guy, I knew why he was stopping him," Tr. 113:16-17, and "I knew that [Zakiewicz] saw what I saw because he said 'I'm gonna stop this guy'" Tr.

115:9-10. But in between those two statements Jwayyed testified that she and Zakiewicz stop people for lots of different reasons, including for smoking marijuana and looking like they just stole something. Tr. 113:23-114:18. Some of those reasons connote impending danger; others do not. So the fact that Zakiewicz said he wanted to stop Mayo could not have also conveyed that Zakiewicz had seen a weapon. Also, even if Jwayyed in fact believed that Zakiewicz had seen the gun, it was Sergeant Kipp, not Zakiewicz, who approached Mayo with her. He certainly had not indicated any knowledge on his part that a gun was on the scene; if Jwayyed had seen one, she would have warned him. Finally, it is telling that when Jwayyed got out of the car to stop Mayo, she did not draw her weapon, Tr. 143:10-13 (Jwayyed), a curious practice when seizing an armed suspect on an empty street at night unless, as I find, she did not know when she stopped him that he was armed.

Sergeant Kipp did not see a weapon before Mayo was stopped. Tr. 128:16-18, 137:7-8, 141:21-23. Nor did he hear either of his subordinates say they had seen one. Tr. 128:23-129:8, 141:9-13. He confirmed my understanding that it is very important for officers to alert their colleagues to the presence of a weapon. Tr. 141:24-142:1. He conceded that if Zakiewicz and Jwayyed had seen a firearm in Mayo's waistband, they should both have warned their fellow officers of that fact. Tr. 142:9-12.

In sum, I find that Zakiewicz decided to do precisely what he said he wanted to do: stop Mayo. No warning about a weapon was given because none of the law enforcement officers in the car knew or had reason to suspect Mayo had a weapon. After Mayo was stopped they discovered the gun in his waistband. In order to prosecute him successfully, a justification for the stop was needed, and Zakiewicz and Jwayyed alighted upon the claim that they had seen the weapon first. But since their supervising officer happened to be present, and would testify

9

that neither one mentioned anything about a weapon until after the stop had occurred and Mayo had raised his hands, they had to further testify that even though they both saw the gun, they both remained strangely (and dangerously) quiet about that extremely important fact. I do not credit that testimony and as a result I granted the motion to suppress the firearm.

                                                    John Gleeson, U.S.D.J.

Dated: August 15, 2013
       Brooklyn, New York